AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3215 W. Woodmen Road, Colorado Springs, CO, 80919,<br>more fully described in Attachment A, attached hereto. | )<br>)<br>) Case No. 17-sw-05134-MEH<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A attached hereto and hereby incorporated by reference.

located in the _____ District of ____Colorado____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1956-1957 | Money Laundering |

The application is based on these facts:

See Affidavit attached hereto and hereby incorporated by reference.

☑ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/ Gregory Turner
*Applicant's signature*

Gregory Turner, Special Agent, FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.

☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **02 Feb 2017**

Michael E. Hegarty
*Judge's signature*

City and state: Denver, CO

Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

The Subject Premises is located at 3215 W. Woodmen Road, Colorado Springs, CO 80919.  The Subject Premises is more particularly identified as a five bed, four bath, 5,401 square foot house.  The SUBJECT PREMISES is further described as a three-story home that is off white in color with a red tile roof.  The numbers "3215" appear above the garage door.  A photograph of the SUBJECT PREMISES appears below:



## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

The following items, located within the residence at 3215 W. Woodmen Road, Colorado Springs, CO 80919 (the Subject Premises) that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956-57 (Money Laundering) from July 2012 to the present, including the following:

1. Any records, documents, correspondence, or materials pertaining to Pablo M. Rivera's (Rivera) position as the Chief Financial Officer (CFO) with University of the Nations/Youth With a Mission (UON).

2. Any records, documents, correspondence, or materials pertaining to KJ Walk Inc., Westside Electric, Bolton Inc., Calvin's Plumbing, and Hawaii Lawn and Landscape.

3. Any records, documents, correspondence, or materials pertaining to Hawaii Human Resources, Inc.

4. Any financial and accounting records, documents, programs, evidence of wealth, applications, correspondence, or materials of financial institutions or money transmitters, including but not limited to, Bank of Hawaii, Central Pacific Bank, Wells Fargo, MoneyGram, Wedbush Securities, or their employees or affiliated associates, including but not limited to bank statements, balance sheets, bank reconciliations, income statements, tax records, tax payments, cost of goods sold records, credit card statements, checks, deposits, withdrawals, remittances, safety deposit box records and keys, transfers, electronic transfers of money, wires, and related correspondence, general ledger, sales ledger, cash receipts journal, cash disbursements journal, adjusting journal entries and evidence of cost of goods sold.

5. Address verification and establishment documents, escrow statements, deeds of trust, mortgage documents, grant deeds, rental and lease agreements and other documents showing dominion and control over real estate property (including in Hawaii County and in El Paso County, Colorado) as well as documents showing dominion and control over other residences, businesses and/or storage units. These documents would include but are not limited to rental and/or lease agreements, mortgage records, keys, and utility and telephone billing records.

6. Any records, documents, materials, or correspondence pertaining to diamonds, gold, and precious metals, including but not limited to the mining and sale of diamonds and gold.

7. Any records, documents, materials, receipts, or correspondence pertaining to Rebel Auction Co.

8. Any records, documents, materials, receipts, or correspondence pertaining to SyQwest Inc.

9. Any records, documents, materials, receipts, or correspondence pertaining to Michael David Brookshire, Gregg Lyell, James Mansaray, and Charles Lebbie.

10. Any and all items and/or documents that would tend to identify persons who acted as facilitators or co-conspirators in acts of fraud and related activity in connection with wire fraud and/or money laundering including, but not limited to, pictures and/or photographs depicting an association with co-conspirators, financial documents, correspondence, vehicle registration/title document, telephone answering device tapes, and billing records for telephones, cellular telephones, and paging devices.

11. Cash, precious metals, gold, diamonds, gift cards and gift certificates, whether in physical or digital form.

12. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956-57 (Money Laundering).

13. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956-57 (Money Laundering).

14. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f. evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    i. contextual information necessary to understand the evidence described in this attachment;

    j. volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

    k. any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956-57 (Money Laundering);

    l. items otherwise described above in paragraphs 1-11 of this Attachment B.

DEFINITIONS:

15. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

16. As used above, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

# AFFIDAVIT

I, Gregory Turner, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI), Department of Justice, and have been so employed since December 2014. I am a Certified Public Accountant and Certified Fraud Examiner currently assigned to a white collar crime squad at the FBI Honolulu Field Office in Honolulu, Hawaii. My current duties include investigating financial crimes to include mail fraud, wire fraud, identity theft, bank fraud, and money laundering. In the course of my duties, I have prepared search and arrest warrants and have participated in the execution of search and arrest warrants.

2. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956-57 (Money Laundering) (the Subject Offenses).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1956-57 (Money Laundering) are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## TECHNICAL TERMS

5. Based on my training and experience, I use the following technical terms to convey the following meanings:

6. "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

7. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical,

1

arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## SEIZURE AND SEARCH OF COMPUTERS

8. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

9. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

10. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

11. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail

programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

12. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

13. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

14. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

15. Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. As set forth herein, during the wire fraud scheme, Pablo Rivera utilized one or more electronic devices to email a series of false and fictitious invoices to the victim.

16. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example,

3

registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

17. Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

18. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

19. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

20. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary

4

      scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

  B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

  C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

21. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment.  This is true because of the following:

  A. The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

  B. The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

C. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

D. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

E. Need to review evidence over time and to maintain entirety of evidence. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all

evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

22. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

23. Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

24. Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, telephone bills, correspondence and other identification documents.

25. Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## INVESTIGATION

26. The FBI is conducting an investigation into Pablo M. Rivera (Rivera) for the Subject Offenses.

27. <u>Scheme to Defraud:</u> The investigation has revealed that from a precise earlier date unknown but by at least August 2014, and continuing through January 2017, in the District of Hawaii and elsewhere, Rivera did knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money and property from the University of the Nations/Youth with a Mission (UON), by means of materially false and fraudulent pretenses and representations and promises, as well as omissions of material facts, well knowing at the time that such pretenses, representations, promises, and omissions would be and were false when made. Such false statements, representations, promises and omissions included the following:

  A. Rivera was the Chief Financial Officer (CFO) of UNO and UNO tasked Rivera with hiring and paying contractors to do various jobs on UON's Kailua-Kona,

7

Hawaii, campus.  Rivera sent a series of false and fictitious invoices to UON which purported to reflect the true costs and labor charges of work performed by contractor KJ Walk.  In truth and in fact, however, Rivera was submitting altered KJ Walk invoices to UON, which falsely inflated the actual costs and wages for work performed by KJ Walk.

  B. Rivera submitted the false KJ Walk invoices to a UON accounting specialist, which resulted in UON, on numerous occasions, transferring funds from UON's checking account to a KJ Walk corporate account that was controlled by both KJ Walk and Rivera.  Once the money was transferred to the KJ Walk corporate account, Rivera made numerous withdrawals from the KJ Walk account for his own personal benefit.  When confronted by an owner of KJ Walk about the withdrawals that Rivera made from the KJ Walk corporate account, Rivera falsely claimed that the withdrawals were made to pay subcontractors.  In truth and in fact, Rivera did not use the withdrawals to pay subcontractors and, instead, kept the money for himself.

28. <u>The Wire Communications</u>:  On numerous dates, including on December 19, 2016, in the District of Hawaii and elsewhere, and for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, Rivera did knowingly transmit, and cause to be transmitted, certain writings, signs, signals and sounds in interstate commerce, namely electronic emails from a Gmail account he controlled in Colorado to an email account in Kailua-Kona, Hawaii, concerning KJ Walk invoices.  Gmail is controlled by Google, Inc., and there are no Gmail servers in the state of Hawaii.

29. <u>Details of the Investigation:</u> On January 25, 2017, the UON Security Director contacted the FBI and advised that UON CFO Rivera had embezzled between $1.5 million and $2 million.  UON is a Christian university with branches in 600 locations in 142 countries, providing programs in over 100 languages around the world. One of UON's largest locations is in Kona and is located at 75-5851 Kuakini Highway, Kailua-Kona, Hawaii.

30. The Security Director informed the FBI that Rivera was soon to be travelling to Sierra Leone, Africa.  The Security Director told the FBI that Rivera has worked at UON as CFO since December 2014 and resides in Colorado Springs, Colorado.  Rivera's LinkedIn biography indicates that he began working for UON in July of 2012.

31. UON contracts with KJ Walk Inc. of Savage, Minnesota, to perform construction and maintenance at the Kona campus.  On or about January 24, 2017, the owner of KJ Walk met with a trustee and management at UON due to his concern regarding excessive amounts of money, deposited by UON, moving through KJ Walk's corporate bank account.  Specifically, the owner of KJ Walk noted that Rivera had recently claimed to have made disbursements from the KJ Walk corporate bank account (which Rivera was a signatory on) to Westside Electric Company (Westside), an electrical subcontractor, and Bolton, Inc. (Bolton), an excavating subcontractor.  The owner of KJ Walk told UON that the work that Rivera claimed Westside and Bolton had completed was, in reality, never performed or even authorized by KJ Walk.

32. The owner of KJ Walk advised FBI agents that Rivera directed him to add Rivera as an authorized signer on KJ Walk's corporate bank account due to Hawaii regulations.  The

owner of KJ Walk complied with Rivera's request and placed Rivera on KJ Walk's corporate bank account at Central Pacific Bank.

33. The owner and a vice-president (VP) of KJ Walk recently questioned Rivera about incoming funds to the KJ Walk corporate bank account. Thereafter Rivera emailed KJ Walk's VP on January 11, 2017, an excel spreadsheet, which included, but was not limited to, the following fraudulent expenditures pertaining to subcontractor invoices: (1) check number 1196, purported to be payable to Westside Electric, dated 07/14/2016, in the amount of $31,200.00; (2) check number 1201, purported to be payable to Bolton, dated dated 8/28/2016, in the amount of $83,280; (3) check number 1202, purported to be payable to Westside Electric, dated 09/07/2016, in the amount $52,310; (4) check number 1203, purported to be payable to Westside Electric, dated 09/27/2016, in the amount of $25,000; (5) check number 1207, purported to be payable to Westside Electric, dated 10/27/2016, in the amount of $52,000; (6) check number 1209, purported to be payable to Westside Electric, dated 11/14/2016, in the amount of $50,000; (7) check number 1212, purported to be payable to Westside Electric, dated 12/27/2016, in the amount of $75,000; and (8) numerous other checks and transfers, purported to be paid to the following subcontractors: Westside, Bolton, Calvin's Plumbing, and Hawaii Lawn and Landscaping.

34. On January 26, 2017, the owner of KJ Walk advised FBI agents that neither he nor any representative of KJ Walk authorized work to be done by Westside or Bolton from July 2016 through December 2016. Due to the owner's suspicion he contacted the owners and/or representatives from Westside and Bolton who advised that no work had been performed during that time period on behalf of Westside or Bolton at UON.

35. On January 26, 2017, KJ Walk's onsite foreman at UON confirmed to FBI agents that no work had been performed from July 2016 to December 2016 by Westside or Bolton. Additionally, on January 26, 2017, FBI agents spoke with the licensed contractor for Westside who advised the work for the payments referenced above was never performed at UON and no payments were received by Westside.

36. On January 26, 2017, FBI agents reviewed returned checks from KJ Walk's corporate bank account and found that the purported disbursed checks to Westside and Bolton (as well as other subcontractors) that were referenced on the excel spreadsheet in paragraph 33 never occurred. Instead, the returned checks revealed Rivera wrote checks to himself in amounts that corresponded to the purported Westside/Bolton payments referenced in paragraph 33. More specifically, a sampling of the checks revealed the following: (1) check number 1196, dated 07/11/2016, payable to Pablo M. Rivera in the amount of $31,200; (2) check number 1201, dated 8/28/2016, payable to Pablo M. Rivera in the amount of $83,280; (3) check number 1202, dated 09/03/2016, payable to Pablo M. Rivera in the amount of $52,310; (4) check number 1203, dated 09/20/2016, payable to Pablo M. Rivera in the amount of $25,000; (5) check number 1207, dated 10/05/2016, payable to Pablo M. Rivera in the amount of $52,000; (6) check number 1209, dated 11/06/2016, payable to Pablo M. Rivera, in the amount of $50,000; and (7) check number 1212, dated 12/27/2016, payable to Pablo M. Rivera in the amount of $75,000.

37. FBI agents reviewed copies of the back of the returned checks disbursed from KJ Walk's account that were payable to Pablo M. Rivera and learned that the checks were deposited into a Bank of Hawaii bank account as well as other unknown accounts.  UON has no bank accounts at the Bank of Hawaii.

38. In order to further Rivera's fraudulent scheme to embezzle funds from UON, Rivera utilized his personal Gmail email account to send a UON Financial Services Manager in Kailua-Kona, Hawaii, altered and inflated invoices.  As set forth above, Rivera normally did not work on the Kailua-Kona UON campus, but instead worked primarily from Colorado, his residence in Colorado.  Therefore, the emails that Rivera sent moved in interstate commerce.  I also know from speaking with other federal agents that Gmail has no servers in Hawaii.

39. On January 26, 2017, FBI agents interviewed a UON employee who is an accounting specialist that was directed by UON management to conduct an audit of the invoices emailed by Rivera.  The audit revealed the following:

    A. From July 1, 2016 until September 2, 2016, UON paid KJ Walk at the direction of Rivera $276,944.40.  The original payroll invoice for KJ Walk was actually $40,832.86, a total difference of $236,111.64.

    B. From September 9, 2016, through November 11, 2016, UON paid KJ Walk at the direction of Rivera $376,944.40.  The actual KJ Walk payroll amount was $40,632.36, a total difference of $336,312.04.

    C. From November 18, 2016 through December 23, 2016, UON paid KJ Walk at the direction of Rivera $352,166.64.  The actual KJ Walk payroll amount was $24,434.71, a difference of $327,731.93.

40. Specific examples of invoices that Rivera, via his Gmail account, sent to a UON Financial Services Manager revealed the following discrepancies:

    Invoice #091113-1
    ProService Human Resources, Inc. (ProService), a payroll entity, sent an original invoice, dated 12/09/2016, to KJ Walk and to Rivera for $2,422.75.  Rivera forwarded an altered version of the original invoice, also bearing invoice number 091113-1, dated 12/09/2016, via email to the UON Financial Services Manager's email with an inflated amount of $16,281.24.

    Invoice #090713-2
    ProService sent an original invoice, dated 12/02/2016, to KJ Walk and to Pablo Rivera for $1,649.21.  Rivera forwarded an altered version of the original invoice, also bearing invoice number 090713-2, dated 12/02/2016, via email to the UON Financial Services Manager's email with an inflated amount of $12,301.85.

    Invoice #090057-1

ProService sent an original invoice, dated 11/18/2016, to KJ Walk and to Pablo Rivera for $2,424.05.  Rivera forwarded an altered version of the original invoice, also bearing invoice number 090057-1, dated 11/18/2016, via email to the UON Financial Services Manager's email with an inflated amount of $16,281.24.

Invoice #090058-2
ProService sent an original invoice, dated 11/18/2016, to KJ Walk and to Pablo Rivera for $1,650.37.  Rivera forwarded an altered version of the original invoice, also bearing invoice number 090058-2, dated 11/18/2016, via email to the UON Financial Services Manager's email with an inflated amount of $12,301.85.

41. In an email from Rivera's Gmail account to the Financial Services Manager in Kailua-Kona, Hawaii, dated December 19, 2016, Rivera attached invoices, which included the four invoices referenced in the paragraph above, and stated the following in the body of the email:

    From: Pablo Rivera [mailto:EMAIL ADRESSS REDACTED]
    Sent: Monday, December 19, 2016 10:25 AM
    To: [NAME REDACTED]
    Subject: KJ Walk
    NAME REDACTED,
    Please see reconciled KJ Walk invoices.  Please wire $206,837.71 to the Hawaii account on monday.
    thanks,
    Pablo

42. On January 26, 2017, FBI agents interviewed the UON Financial Services Manager, who advised that she deposited $206,837.71 into the KJ Walk corporate bank account as directed by Rivera.  The UON Financial Services Manager also advised that during the scheme she received numerous other emails from Rivera which were similar to the email Rivera sent above.

43. On January 31, 2017, Rivera met with the UON President.  The UON President agreed to consensually record the meeting.  During the meeting Rivera, among other things, became emotional, crying at times, and admitted that he embezzled $500,000 from UON.  A review of UON's accounting records, as well as the KJ Walk bank statements, reveals that Rivera defrauded UON of approximately 2.5 million dollars.  Those records reveal, among other things, that Rivera wrote unauthorized checks to himself from the KJ Walk account in the amount of 2.54 million dollars.

44. Following the January 31, 2017, meeting described above, FBI agents executed an arrest warrant which had previously been signed by United States Magistrate Judge Kenneth J. Mansfield (from the District of Hawaii) on January 27, 2017.  Rivera did not make a statement.

45. I have reviewed banking records from both KJ Walk's corporate account at Central Pacific Bank and Rivera's checking account at the Bank of Hawaii.  Among other things, these

records reveal that Rivera was depositing KJ Walk checks into his Bank of Hawaii bank account. After these fraud proceeds were deposited into his Bank of Hawaii account, Rivera, on multiple occasions laundered the proceeds by sending international wires to an account he controlled in a foreign country. Based on my review of Bank of Hawaii records from July 2015 through December 2016, these international wires were in excess of $150,000. In addition, the Bank of Hawaii records also show international wire transfers of fraud proceeds to the following individuals: Michael David Brookshire, James Mansaray, and Charles Lebbie. Open source research reveals that James Mansaray and Charles Lebbie may reside in Sierra Leone, Africa. The Bank of Hawaii records also show two domestic wire transfers of fraud proceeds to Gregg Lyell. Open source research reveals that Gregg Lyell is associated with investments in diamond and gold mining in Sierra Leone, Africa. The Bank of Hawaii records also show domestic wire transfers of fraud proceeds to SyQwest, Inc., and Rebel Auction Co. Open source research reveals that SyQwest, Inc., sells high resolution echo sounders and acoustic systems for precision seafloor exploration and that Rebel Auction Co. auctions farm equipment and real estate. I am able to say with certainty the wire transfers described above involved fraud proceeds because the only source of funds deposited into Rivera's Bank of Hawaii account from July 2015 through December 2016 was unauthorized checks Rivera wrote to himself from the KJ Walk corporate account.

46. On February 1, 2017, FBI agents in Kailua-Kona, Hawaii, executed a search warrant on a laptop bag and suitcase that belonged to Rivera. Therein, agents discovered multiple pieces of evidence that suggest that Rivera is involved with gold mining in Sierra Leone, Africa. For example, agents found a Sierra Leone gold dealers license in Rivera's name, as well as a passport that reflected travel to Sierra Leone in 2016. Also found, was a wire transfer request from January 19, 2017, wherein Rivera transferred money to a law firm in New Jersey. On the request, Rivera listed his address as the Subject Premises. In addition, a tax record database in El Paso County, Colorado, shows that Rivera purchased the Subject Premises on or about September 6, 2016. In addition, on January 31, 2017, when Rivera was arrested and booked by federal agents on a criminal complaint charging wire fraud from the District of Hawaii, he informed the agents that he resided at the Subject Premises.

47. Based on my knowledge, training, and experience, I have knowledge of common practices of subjects who commit fraud. In particular, I am aware that individuals who commit wire fraud and money laundering often keep documents, financial records, credit cards, digital files, and paperwork reflecting historical transactions in their possession or on their computers. Further, individuals who commit fraud and money laundering also maintain detailed records of their activities. I know these records are kept in both electronic and paper formats and are typically maintained in perpetuity as fraudsters desire to be able to retrieve records and information if needed or requested by financial institutions, businesses, and the government.

48. Based on my knowledge, training, and experience, I know that individuals who commit fraud and money laundering typically retain financial records and documents relating to bank accounts, including check books, money market accounts, checking accounts, safe deposit boxes, investment accounts, stock fund accounts, 401k funds, mutual funds, retirement funds, bonds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, credit cards, ATM, and debit card accounts.

49. Based on my knowledge, training, and experience, I also know that individuals who commit fraud use computers and other digital devices to carry out their schemes. I have reviewed electronic records from UON that indicate Rivera utilized one or more electronic devices to carry out his scheme.

## CONCLUSION

50. Based on the investigation described above, probable cause exists to believe that at the residence located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1956-57 (Money Laundering) (described on Attachment B).

51. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing [as amended] is true and correct to the best of my information, knowledge, and belief.

                                          __s/Gregory Turner_____
                                          Gregory Turner, Special Agent
                                          FBI

Submitted, attested to, and acknowledged by reliable electronic means on February  2nd, 2017.

                                          BY THE COURT:

                                          _/s/ Michael E. Hegarty_____
                                          HON. MICHAEL E. HEGARTY
                                          UNITED STATES MAGISTRATE JUDGE
                                          DISTRICT OF COLORADO

**Application for search warrant was reviewed and is submitted by Martha Paluch, Assistant United States Attorney (District of Colorado).**